UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BARBARA HURST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:05-cv-877-JDT-TAB |
| ) | |
| BALL MEMORIAL HOSPITAL, INC., ) | |
| ) | |
| Defendant. ) | |

### **ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. #32)**[1]

Plaintiff, Barbara Hurst, worked for Defendant, Ball Memorial Hospital, Inc. ("BMH"), for over 21 years as a Licensed Practical Nurse ("LPN") prior to her employment being terminated on November 3, 2004. She claims that she was terminated either because of her age, her gender, or the fact that she was utilizing the leave provisions of the Family and Medical Leave Act ("FMLA"). BMH contends that it terminated Hurst because she had no good explanation for why her name appeared on three consecutive weekly drug dispensing system reports which are designed to highlight any higher than normal removal rate of narcotic drugs from computerized storage cabinets. It also claims that her termination was related to Hurst's own inability to account for 40 Vicodin tablets that were not recorded as administered on patient charts, but were removed from storage by Hurst. A summary judgment motion has

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

been filed by BMH and the case is before the court now for resolution of that motion. For the reasons discussed herein, the court finds merit in the motion.

I.      *Factual Background*

Barbara Hurst graduated from BMH's nursing program in August of 1982 and accepted employment with BMH as an LPN beginning in January of 1983.  She worked nearly her entire career in the surgical recovery area of the hospital, with a solid performance record.  As a result of certain diagnosed immune system deficiencies and sinusitis, Hurst requested and was provided with intermittent FMLA leave beginning in 2000.  The intermittent leave allowed her to receive infusions and miss work for a short time if there was a bad reaction to the infusion or if she incurred an infection.  In 2004 Hurst made her annual request for intermittent leave in February.  After providing the required documentation and physician's certification of her serious health condition, she was approved for leave of up to two days per month for calendar year 2004.

Among other responsibilities, Hurst administered medications to patients and was required to follow hospital policies with regard to dispensing and accounting for these medications.  In the surgical recovery unit, the medicine dispensed consisted mainly of narcotic pain relievers. To assist in tracking and billing for the administration of Schedule II, III and IV drugs, MHB relied on its Pyxis System ("Pyxis"), which was a computerized secure medication storage and dispensing tool.  Pyxis dispenses narcotics to licensed personnel at various storage locations in the hospital.  After the employee wishing to remove the narcotic enters a password and their fingerprint for

identity verification purposes, the drug is dispensed and the patient to whom it is to be given is recorded.  According to BMH, if all is working as intended the process follows these steps:

> 1) a patient requests medication;
>
> 2) a nurse checks the patient chart for the last time the requested drug was administered;
>
> 3) if the timing is appropriate the nurse accesses Pyxis;
>
> 4) the nurse checks for any potential patient allergic reaction through an automatic Pyxis cross-reference pop-up screen;
>
> 5) Pyxis allows the nurse to take a dose from storage and administer to patient;
>
> 6) the nurse double-checks patient chart and patient armband to assure that correct medication is being given to the correct patient;
>
> 7) the nurse asks the patient about his or her current pain level; and
>
> 8) the narcotic is administered and the nurse documents the time and route (oral or injection) of the narcotic delivery on the patient's chart.

Anytime narcotics are removed from Pyxis, but for some reason not given to the patient, BMH policy requires that they be destroyed by the nurse who obtained them with a second nurse witnessing the destruction.  Pyxis does not allow for narcotics to be returned to the secured storage cabinets.

An advantage of Pyxis is that it can generate several data reports with respect to the administration of narcotics at the hospital.  At BMH, Tina Love, Director of Inpatient Pharmacy, generates weekly Pyxis Proactive Diversion reports ("PPD report").  The report sets out the names of any employee who accesses Pyxis to dispense a narcotic

at a level deemed to be substantially higher than expected. More specifically, the report lists any employee's Pyxis activity which is greater than four standard deviations above the mean. The activity is then reviewed based upon the length of the activity, the drug involved, the doses per day, and any existing trend. Based on her review, Ms. Love then decides if further investigation by the employee's supervisors is necessary.

On October 11, 2004, Plaintiff's name appeared on the weekly PPD report for the period of October 4th through October 11th. The nursing manager for Hurst's area, Mary Harrington, was sent a copy of the report by Ms. Love with direction to review and follow-up on as deemed necessary. Harrington was on a temporary leave of absence, so when Hurst's name appeared on the report again the following week, Love sent both the reports to Harrington's supervisor, Rosalyn "Roz" Brown. Hurst's name appeared on the next PPD report as well, making it three weeks in a row that she was listed as having obtained Hydrocodone (commonly referred to by the brand name Vicodin) from the Pyxis system at a level more than four standard deviations above the norm. Hydrocodone is a habit forming narcotic pain reliever, which the Drug Enforcement Administration lists under its Schedule II of controlled substances.

Ms. Brown began investigating Hurst's Hydrocodone dispensing activities after she received the second of the three PPD reports. In conducting her investigation, Brown compared records of Hurst's removal of the drug from Pyxis to the charts of Hurst's patients. She discovered that there was not a corresponding entry on patient charts for many of the times that Hurst had removed Hydrocodone tablets from Pyxis. There were also a number of chart entries where the time the drug was administered

did not jive with the time that the drug was removed from Pyxis.  Further investigation indicated that if Hurst had destroyed the Hydrocodone tablets, they were not destroyed or "wasted" according to hospital policy with a second nurse witnessing and verifying the destruction of the medication.

On October 21, 2004, the person at BMH in charge of monitoring leave for nurses sent Hurst a letter notifying her that she had missed three days in a row for medical reasons and that her pre-approved FMLA leave was for up to two days.  Hurst was told that if she wanted to have the third day qualify as FMLA leave, she needed to have her physician provide recertification documentation relating the need for additional intermittent time off.  That documentation was provided and Hurst's physician noted the need for three to seven days off per month, but Hurst never used any of the additional leave requested as her employment was terminated at about the same time as the documentation was provided.

After receiving the third PPD report on October 24, 2004, and finding Hurst's name listed again, Brown decided that she needed to meet with Hurst.  On October 27, 2004, Brown met with Hurst and informed her that her name had turned up on a PPD report three consecutive weeks.  Numerous Hydrocodone tablets Hurst had obtained from Pyxis during the first three weeks of October were unaccounted for according to Brown's review of the charts.  Brown asked that Hurst account for the missing tablets. Hurst did not challenge the accuracy of the report, and to this day still poses no claim that the report was in any manner inaccurate.  She did, and still does, claim that all medication she took from Pyxis was at the request of a patient.  However, she

contradicts herself by acknowledging that she took medication out of Pyxis for other nurses and for nursing students (who are not authorized to access Pyxis), claiming this was a common practice of all nurses. She also admitted wasting medications that could not be used without obtaining a witness to verify destruction of the drugs.

The October 27 meeting concluded with Hurst signing off on a written discipline report which called for a three day suspension. The basis for the suspension was Hurst's extraction from Pyxis of "40 doses of an oral narcotic that has (sic) not been accounted for." The written discipline report warned that if further investigation resulted in a determination that she had violated hospital policy and standards with regard to the distribution or dispensation of controlled substances, she could be terminated. It also contained an instruction that Hurst must account for the missing medication and complete an action plan to prevent further problems with her administration of narcotics. Following the meeting with Brown, Hurst set forth in writing what she believed to be the cause of the missing narcotics, which included her removing drugs from Pyxis for other nurses and students, forgetting to double check her charting, and providing drugs to patients that were not actually assigned to her that day. She also drafted an action plan that stated she would double check her charts, not take drugs out of Pyxis for others, and be more consistent with her documentation.

Hurst never had an opportunity to present her action plan. On November 3, 2004, she was called to a meeting with Brown, Harrington, and a member of the BMH human resources staff where her employment was terminated. Brown related to Hurst that her investigation revealed additional problems with narcotic administration,

including the fact that one of the patients to whom Hurst claimed to have given Hydrodone, had actually been in another part of the hospital receiving dialysis treatment at the time Hurst supposedly administered the drug. Brown's investigation also revealed that on other occasions Hurt's removal of Hyrocodone for a particular patient was followed in minutes by another nurse's removal of the drug for the same patient and only the other nurse charted the actual administration of the drug. Hurst related that she had not been herself lately. She was taking a new medication that may have caused her to be less attentive and she was having a problem with a bank threatening foreclosure. Despite her request that she be given a second chance and her willingness to have her locker and person searched, to take a drug test and otherwise submit to any disciplinary requirements short of termination, she was fired. Hurst signed the written discipline sheet outlining the reason for her termination, adding a note that she did not accept the reason for her termination because it was "investigated poorly." She was 44 years old at the time her employment was terminated.

## II.     *Summary Judgment & Evidentiary Standards*

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of material

fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Id.* at 255.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A party moving for summary judgment on a claim on which the nonmovant party bears the burden of proof at trial may discharge its burden by showing, "that is, pointing out," an absence of evidence to support the nonmovant's case. *Id.* at 325.

A plaintiff may demonstrate intentional discrimination through either the direct method or indirect method. *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). The direct method of proof permits a plaintiff to show, by way of direct or circumstantial evidence, that the adverse job action taken against her was motivated by an impermissible purpose, such as gender, age or proscribed retaliation as alleged in this case. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998)). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotations and citations omitted). If, under the direct method of proving discrimination, a plaintiff relies on circumstantial evidence to support her claim, the evidence "must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citing *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

A plaintiff who lacks sufficient evidence to prove discrimination directly must proceed under the indirect method, familiarly known as the *McDonnell Douglas* burden-shifting test. *Id.* "If the plaintiff establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination." *Id.* (citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)).

### III. Discussion

Plaintiff asserts that she was fired either because of her gender, in violation of Title VII of the Civil Rights Act of 1964, her age, in violation of the Age Discrimination in Employment Act ("ADEA"), or because of her use of FMLA benefits, in violation of that statutory scheme. In this case, both parties agree that the Plaintiff proceeds under the indirect method of proof, because there is no direct evidence that she was fired because of her gender, age, or as retaliation for pursuing FMLA leave. Accordingly, she must put forth sufficient evidence to establish a prima facie case, the elements of which consist of the following:

> 1) The Plaintiff must be a member of a protected class, in this case a female with regard to her claim of gender discrimination, over 40 years of age for age discrimination purposes, and a person who has engaged in statutorily protected activity for her retaliation claim;
>
> 2) The Plaintiff must be meeting her employer's legitimate performance expectations;
>
> 3) The employer must have taken an adverse employment action against the Plaintiff; and,

> 4) Other similarly situated employees, who were not members of the protected class or did not engage in protected activity, were treated more favorably than the Plaintiff.

*Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006); *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 861-62 (7th Cir. 2005). If she puts forth a prima facie case, then the burden shifts to her employer to articulate a legitimate reason for its actions. *Fane*, 480 F.3d at 538. If that occurs, Hurst's last chance is to show that the reason articulated is a pretext for illegal discrimination. *Id.*

BMH challenges only the second and fourth elements of Plaintiff's prima facie case. Among other arguments, the hospital asserts that Hurst has admitted to taking drugs from Pyxis at the request of other nurses or to assist nursing students who did not have access to Pyxis, thereby breaching the nursing and hospital standards that require that a nurse witness or verify the actual administration of any narcotic for which the nurse has undertaken responsibility. According to the hospital this is an admission that she was not performing as expected. Further, BMH states that Hurst has not, and can not, show that anyone outside the asserted protected classes was ever treated more favorably under similar circumstances. In this case, as in many others, the second and fourth elements of the prima facie case tend to intersect when the Plaintiff asserts that others outside the protected class were not similarly punished for engaging in the conduct which constitutes the deficiency in performance asserted by the employer. And, both elements often blend into any pretext analysis as well. *See Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). However, when

disparate discipline is asserted, a plaintiff must demonstrate that he or she was punished differently from other employees who are similarly situated. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

To be similarly situated, another employee must be directly comparable in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). With disparate discipline claims, that normally entails a showing that the employees being compared shared the same supervisor, the same work standards, and engaged is similar misconduct without distinguishing or mitigating circumstances that would explain the difference in discipline rendered. *Radue*, 219 F.3d at 618. It is here where Hurst's claim fails even the most liberal application of the prerequisite. For no nurse, of any gender or age, has had their name turn up on three consecutive PPD reports as accessing Pyxis for a particular drug at a level of at least four standard deviations above the mean. In fact, the employees Hurst has suggested in her interrogatory responses as appropriate comparators, have *never* had their names listed on a PPD report.

Charles Winn was a nurse who worked on the same unit as the Plaintiff. Hurst claims Winn has admitted to obtaining drugs from Pyxis at the request of other nurses and asking other nurses to pull drugs from Pyxis for his patients, but was only warned about this conduct after Hurst was fired.[2] However, Winn's name was never on a PPD

---

[2] While Winn admits in his deposition that in the past he may have obtained drugs from Pyxis for student nurses to administer, he does not admit to asking other nurses to access Pyxis

report and he was never investigated for potential diversion of drugs, nor was he ever unable to account for drugs for which he had accepted responsibility for dispensing. Consequently, Winn is not a similarly situated employee.

With respect to her claim that BMH violated the ADEA by discriminating against her based on age, Hurst points to Chanel Flake, a Registered Staff Nurse four years younger than she is, from whom Hurst obtained a statement regarding a conversation Flake had with Roz Brown. Flake confirmed at her deposition that on October 27, 2004, she had a conversation with Brown where she confirmed that nurses would sometimes sign out a narcotic through Pyxis for student nurses when instructors were busy. Again, this alone in no way puts Flake in the similarly situated category. Flake was never listed on the PPD report, was never investigated for potential drug diversion or found unable to account for drugs she accepted responsibility for administering. Furthermore, Flake was 40 years old and only four years younger than Hurst at the time Hurst was fired. For Hurst to prevail on her ADEA claim she must show that the similarly situated person who was treated better was *substantially* younger than she was. *Radue,* 219 F.3d at 618. Four years difference in age is not substantially younger. *Id.* at 619.

Hurst contends, generally, that all nurses in her unit could be seen as similarly situated individuals who were not disciplined in the manner she was for accessing Pyxis for others. This again shows that Hurst misses the point. She may have contributed to

---

for him. The typewritten note he provided to Hurst, which was an exhibit at his deposition, indicates he was warned by Brown not to ask others to access Pyxis for him, but that is not an admission that he had done so in the past.

-12-

her own demise by accessing Pyxis for others, but that was not the circumstance that caused her to be investigated and later fired. Her name on the PPD report two consecutive weeks prompted the investigation and the appearance of her name a third time along with her inability to account for 40 Vicodin tablets led to her termination. She has no evidence that there was any other nurse in circumstances even remotely similar.

As for Hurst's FMLA retaliation claim, she has no evidence other than the timing of her termination to support her claim that she was terminated for engaging in her protected right to use FMLA leave. She was never denied FMLA leave and regularly took leave from 2000 through the end of her tenure. Apparently utilizing FMLA leave was relatively common on her unit, as both Flake and Winn utilized FMLA leave as well. They both testified that they used FMLA leave without incident, and Hurst has offered no evidence that she or any other employee had any problems obtaining leave or that retaliation ensued against any employee. She even admits that under the guidelines previously certified by her physician in February 2004, her intermittent leave was to be for two days a month and that when she missed three days in October 2004, BMH offered to allow the third day to be categorized as FMLA leave so long as she got additional certification from her physician.

Nothing of record points to anything other than the hospital following both the FMLA and its own appropriate guidelines for documentation of leave. The timing of her termination for Pyxis protocol violations and possible drug diversion happened to coincide with her having taken three days off earlier in the month and BMH's appropriate request that she obtain additional physician certification for the day beyond

-13-

the two that automatically qualified as FMLA leave.  "[T]iming alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007).  Furthermore, BMH did not control the timing of Hurst's name appearing on the PPD reports.

Plaintiff's failure to establish a prima facie case is fatal to her claim.  However, even if the court were to look past the prima facie case prerequisite to examine the reason given by BMH for the discontinuation of her employment, there is no evidence that the reason is a lie to cover-up for discrimination.  The written discipline report which was given to Hurst at the time of her termination stated:

> After a four day investigation, it has been determined that there are at least 40 doses of an oral narcotic that has not been Accounted for.  As a result of the investigation, you are being terminated from your position as LPN.  By your own admission, you wasted medications without witnesses, you state that you gave medications without documentation.  It was noted that you re-Moved medication for a patient who was not on the unit, but in dialysis.  A pattern of oral Narco without documentation is present However, you signed out injectibles. You admitted to signing out medications to students without observing the medication being given or documented.  You removed medications that other nurses had documented given to patients.  A three week pattern of 4 std. Deviations above the mean has been reported.  You have not been able to account for the narcotics removed from the Pyxis machine.  This poor performance, neglect of duties related to the safety of BMH patients along with the inability to Account for the missing narcotics is grounds for immediate termination. (*Grammatical, syntax and spelling errors as in original*).

Hurst claims that the reason given is a pretext because BMH offered other reasons for her termination later.  More specifically, Hurst testified in her deposition:

> There was an unemployment form that came in the mail to me that stated that I flunked a drug test, that I had to answer to that.  I was never even

> given the opportunity to take the test. The attorney general had
> information sent to them submitting that I had a substance abuse problem
> and that I had to account for my actions and had five days to get help,
> which was nonexistent.

The basis for Hurst's knowledge of what was sent to the Attorney General or the state agency which handles unemployment compensation is unexplained. She claims to have received some document, but does not produce the document. While substantial changes over time in its explanation for its actions can be evidence that an employer's proffered nondiscriminatory reason is pretext, *see Appelbaum v. Milwaukee Metro. Sewerage,* 340 F.3d 573, 579 (7th Cir. 2003), no admissible evidence of such a change has been presented here. Even if the court assumes that Hurst received some document from the state which suggested that she needed to respond to her employer's claim that she was fired for failing a drug test, there is no way to know whether BMH made such a representation, how it was made, or if some form was misinterpreted by the state. Indeed, someone at BMH could have misinterpreted the termination paperwork when filling out the unemployment compensation response forms. The record is devoid of any supporting evidence for Hurst's vague assertion. All the court is left with is hearsay on hearsay of a potential statement against interest. That is not enough to allow the claim to survive.

### IV.   *Conclusion*

An employer may take action against an employee that seems unfair to a majority of those who become aware of the circumstances, without that action being a

violation of federal discrimination laws. As is often stated, the court's role is not to sit as some sort of super-personnel appeals office. For the reasons discussed in this entry, Barbara Hurst has failed to advance a prima facie case of discrimination and the record does not support a finding that BMH's explanation for firing her was pretext. In the end, Hurst's own answers to questions posed at her deposition amount to a tell-tale sign of why this case is really not about discrimination, but fairness. The exchange the court refers to reads as follows:

> Q. Well, you say she's lying when she says that's why you were terminated. Why would she be lying?
>
> A. I don't feel as if there was an advocate for me in saving my job with Roz. Nothing was done to prevent my termination.
>
> Q. But that doesn't mean that she's lying, does it? It just means nobody was advocating for you, correct? Isn't that what you are saying?
>
> A. Yes.

Accordingly, Defendant's Motion for Summary Judgment (Document #32) will be **GRANTED**.

ALL OF WHICH IS ENTERED this 1st day of June 2007.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Lester H. Cohen
DEFUR VORAN
lhcohen@charter.net

Denise K. LaRue
HASKIN LAUTER LARUE & GIBBONS
dlarue@hlllaw.com

Jay Meisenhelder
HASKIN LAUTER LARUE & GIBBONS
jmeisenhelder@hlllaw.com

Suzanne S. Newcomb
HASKIN LAUTER LARUE & GIBBONS
dlarue@hlllaw.com

Brian M. Pierce
DEFUR VORAN HANLEY RADCLIFF & REED
bpierce@defur.com

Scott E. Shockley
DEFUR VORAN
sshockley@defur.com